**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| SAF-T-GARD INTERNATIONAL, INC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10-CV-07671 |
| | ) | |
| v. | ) | Magistrate Judge Rowland |
| | ) | |
| TRANSWORLD SYSTEMS, INC., | ) | |
| Defendant. | ) | JURY DEMAND |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Plaintiff, Saf-T-Gard International, Inc. individually and as representative of a Class of similarly situated persons, by Class counsel, Keith J. Keogh, respectfully submits the following Memorandum in Support of Final Approval of the Class Action Settlement Agreement ("Agreement") which this Court preliminarily approved on June 10, 2013. Doc. 165[1].

The Court is advised that subsequent to the entry of the preliminary approval order, 8,409 notices of settlement were sent via facsimile and 117 notices of settlement were sent via U.S. first class mail[2]. The affidavit of the claims administrator is attached hereto as *Appendix 1*. There were no requests for exclusion and no objections submitted by Class members. *Id*. There were 124 valid claim forms filed. *Id*.

**I.    OVERVIEW OF THE LITIGATION PRECEDING SETTLEMENT**

Saf-T-Gard brought a class action against Transworld on December 2, 2010 under the Telephone Consumer Protection Act, 47 U.S.C. §227, ("TCPA").

---

[1] Certain dates were extended pursuant to this Court's June 26, 2013 Order. Doc. 169.

[2] The parties believe that the actual number of class members is 8,200 and the claims administer did not remove duplicate numbers prior to sending the facsimile notice.

The TCPA and implementing Federal Communications Commission regulations (Count I) make it unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

Prior to agreeing to a settlement, plaintiff completed thorough and substantial discovery, which involved (1) contested discovery motions; (2) several sets of written discovery requests to Transworld; (3) depositions of sales agents and employees of Transworld[3] including traveling to Tennessee and Pennsylvania for some of the depositions; (4) dozens of subpoenas to third parties for facsimile records[4]; (5) mass e-mails to thousands of sales agents requesting information relating to defendant's practices and follow up contact with persons who responded and (6) attended two settlement conferences.

On July 26, 2011, Judge Lindberg denied plaintiff's motion for class certification.  Doc. 50.

On September 13, 2011, Judge Lindberg denied plaintiff's motion for reconsideration of the class certification order [Doc. 63], but granted plaintiff's amended motion for class certification, which certified the following class: "All persons or entities who without prior express invitation or permission were sent faxes by or on behalf of Defendant promoting its goods or services for sale between December 2, 2006, and December 22, 2010, and who were not provided an 'opt out' notice as described in 47 USC § 227(b)(2)(D)."  Doc. 62.

---

[3]  Transworld also deposed plaintiff.

[4]  Transworld had roughly 60 office locations that potentially sent facsimiles and plaintiff attempted to get records for those offices.

TSI subsequently moved to reconsider the class certification order and filed a motion for summary judgment that asserted in part that it was not liable for any facsimiles sent by independent sales agents. The motion for summary judgment was stayed [Doc. 139] and the motion to reconsider the class certification motion was fully briefed and was pending before Judge Norgle when the parties again attempted to resolve this matter.

Discovery has shown that a sales agent in Illinois sent 97 facsimiles, including the one that plaintiff received. Discovery has also shown that Wilmington Delaware office sent 8,100 facsimiles via an automated process, such that the faxes were sent in numerical order every 2-3 minutes. Doc. 141 p. 10[5]. As such, the parties believes that there are approximately 8,200 Class Members.

Since the parties do not have the facsimiles that were sent by the Wilmington, De. office, TSI has argued that plaintiff cannot prove the facsimiles were unsolicited advertisements.

Plaintiff believes that it can prove the facsimiles were unsolicited advertisements because the Wilmington office manager, Rodney Garrison, who worked as a sales agent in the office at the time of the transmissions, testified that other than faxes to TSI's corporate office,[6] the fax machine in the office was used only to send two types of transmissions to prospective clients: *sample debt collection letters* and *sample customer agreements*. Doc 141 at p. 10-11. Furthermore, the Wilmington, DE office is a sales office. Everyone working in that office is either a sales manager or sales agent, each having the same goal - to advertise and sell TSI's services. Doc 141 at *Exhibit*

---

[5] Whereas normal faxing activity for the Wilmington office is around 50 faxes per month, records for the months in question show between 500 and 2000 faxes sent per month.

[6] As seen from the facsimile records, faxes to the corporate office were rare, and are easily identifiable in the fax records (and ultimately excluded from the class list) by identifying those transmissions sent to the corporate facsimile number. *Exhibit 3 to* Doc 141- *Garrison Deposition Transcript* at 111:1-7.

*3 - Garrison Deposition Transcript* at 50:4-19, 52:21-24, 89:10-90:9, 97:8-98:24.

Although plaintiff believes that it can prove the facsimiles were advertisements, plaintiff is unaware of other similar court decisions.

Transworld has denied and continues to deny each and all of the claims and contentions alleged in the action. Transworld also has asserted and continues to assert many defenses thereto and has expressly denied and continues to deny any fault, wrongdoing or liability whatsoever arising out of any of the conduct alleged in the complaint. Nevertheless, in order to avoid the burden and expense of continued litigation, Transworld considers it desirable that the action and the claims alleged therein be settled.

**MEDIATION**

The parties had a face to face settlement conference at TSI's Illinois office on January 28, 2011. The parties continued to discuss settlement and on August 16, 2011, the parties had a mediation before Judge Nolan that was unsuccessful.

After briefing the motion to reconsider class certification, Judge Norgle referred this matter to this Court for mediation at the parties request on February 21, 2013. Doc. 151.

This Court set the mediation for April 17, 2013. As a result of the continued settlement discussions, the parties reached the settlement that is reflected in the Settlement Agreement executed by the parties, attached hereto as *Appendix 2* prior to the April 17, 2013 mediation.

Counsel for plaintiff has reviewed and analyzed the legal and factual issues presented in this action, the information provided by defendants and third parties in discovery, the risks and expense involved in pursuing the litigation to conclusion, the likelihood of recovering damages in excess of those obtained through this settlement, the protracted nature of the litigation and the likelihood, costs

and possible outcome of one or more procedural and substantive appeals. Based on the review and analysis, and after arms-length negotiations with counsel for defendant, plaintiff entered into the Settlement Agreement.

As demonstrated below, the Agreement is ripe for consideration and final approval.

## II.    THE ADMINISTRATION OF THIS CLASS ACTION SETTLEMENT

### A.    The Preliminary Approval Order.

On June 10, 2013, this Court entered an amended order granting preliminary approval of the Agreement reached between the parties. Doc. 165[7]. In the Preliminary Approval Order ("Order"), the Court specifically found that the proposed terms of the settlement satisfied all of the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3). The Order further established a procedural framework for the final approval of the settlement. The Order required the parties to cause notice certified by the Court to be mailed and faxed to the members of the Class, set deadlines and procedures for submission of claims, requests for exclusion, and objections to the settlement, and set September 17, 2013 for the final approval hearing.

### B.    The Sending of Class Notice.

Subsequent to the entry of the preliminary approval order, 8,409 notice of settlement were sent via facsimile and 117 notices of settlement were sent via U.S. first class mail[8]. The affidavit of the claims administrator is attached hereto as *Appendix 1*. There were no requests for exclusion and no objections submitted by Class members. *Id*. There were 124 valid claim forms filed. *Id*.

---

[7] Certain dates were extended pursuant to this Court's June 26, 2013 Order. Doc. 169.

[8] Once again, the parties believe that the actual number of class members is 8,200 and the claims administer did not remove duplicate numbers prior to sending notice.

C.      The Value of the Settlement.

This Court has previously considered the terms of the settlement in granting preliminary approval of the Agreement.  Pursuant to the Settlement Agreement, and subject to court approval, defendant will provide each Class Member who does not elect the cash option, the use of TSI's Accelerator or Profit Recovery debt collection services for up to twenty-five (25) accounts and for up to two (2) years.  Each Class Member will automatically be entitled to the use of TSI's Accelerator or Profit Recovery Services with no need to submit a Claim Form.  The value of the program is $624.00 per class member for a total value of $5,116, 800.00.  *Appendix 2*.

In addition to the over $5 million dollar benefit the collection services provide, TSI will pay $200.00 to each Class Member who elects to receive cash.[9]

TSI is a debt collection agency that collects debts primarily for the medical industry. Plaintiff has confirmed that the Wilmington facsimiles sent were primarily to medical offices. As such, the use the TSI's Accelerator or Profit Recovery debt collection services can provide a substantial benefit to the class and for those who do not want the service, they can elect to claim cash.

Separate and apart from the above relief, TSI will pay a class representative incentive award to Plaintiff in an amount to be determined by the Court, but not to exceed $9,000.  TSI has also agreed not to object to attorney fees and costs not to exceed $240,000.  *Appendix 2*.

_____

[9]  Subject to Court approval, if TSI is obligated to spend *less than* $125,000 on timely made and accepted claims and to administer the class, then TSI shall be obligated to make a *cy pres* award in the amount of the difference between $125,000 and the amount TSI is obligated to spend on timely made and accepted claims and administration. For example, if TSI is obligated to spend $75,000 on timely made and accepted claims and administration costs, then TSI shall be reimbursed for administration costs with the balance for a *cy pres* award.

**D.      No Objections Were Received.**

No class members have elected to be excluded from the Class, and no Class member has objected to the settlement.  This should be viewed as an endorsement of the settlement by the Class.

**III.      THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT.**

On September 13, 2011, Judge Lindberg found the class satisfies all the requirements of Rule 23 when he granted plaintiff's amended motion for class certification, which certified the following class: "All persons or entities who without prior express invitation or permission were sent faxes by or on behalf of Defendant promoting its goods or services for sale between December 2, 2006, and December 22, 2010, and who were not provided an 'opt out' notice as described in 47 USC § 227(b)(2)(D)."  Doc. 62.

**A.      The Standard For Granting Final Approval To The Class Action Settlement.**

In *Amchem Productions, Inc. v. Windsor*, 521 U.S. 591 (1997), the United States Supreme Court explained that, before approving a class action settlement, the District Court must first be satisfied that the elements of Rule 23(a) and 23(b) have been met.  *Id.* at 621.  This determination was satisfied during the contested class certification briefing and order.

Once the Court has determined that the requirements of Rule 23(a) and 23(b) have been met, the Court must then determine whether Rule 23(e) has been satisfied by determining whether the settlement is fair, reasonable, and adequate.  *General Electric Capital Corporation v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997).

There is usually an initial presumption of fairness when a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced."  H. Newberg, A.

7

Conte, Newberg on Class Actions §11.41 (4th ed. 2002); *Goldsmith v. Technology Solutions Co.*, No. 92 C 4374, 1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975).

As the Seventh Circuit recognizes, courts generally favor settlements of class actions:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, "'there is an overriding public interest in favor of settlement.'" Settlement of the complex disputes often involved in class actions minimizes the litigation expense of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of School Directors of the City of Milwaukee*, 616 F. 2d 305, 312-13 (7th Cir.1980)(citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

The Court considers the following six factors in making this determination:

1. The strength of the plaintiff's case on the merits measured against the terms of the settlement;

2. The complexity, length, and expense of continued litigation;

3. The amount of opposition to the settlement among class members;

4. The presence of collusion in gaining a settlement;

5. The stage of the proceedings; and

6. The amount of discovery completed.

*GE Capital* at 1082. (citing *Donovan v. Estate of Fitzsimmons*, 778 F. 2d 298, 308 (7th Cir. 1985)); *Synfuel Techs., Inc.,* 463 F. 3d at 653; *In re General Motors Corp. Engine Interchange Litig.,* 594 F. 2d 1106, 1132 (7th Cir.1979) (citations omitted); *Isby v. Bayh,* 75 F. 3d 1191, 1199 (7th Cir.1996). Of these considerations, the first is most important. *Synfuel Techs., Inc.,* 463 F. 3d at 653.

8

The class action settlement in the present case satisfies each of the factors outlined in *GE Capital*.

## All Of The Factors Weigh In Favor Of Final Approval

### A.   The $200 Cash or $624 debt collection service Provide Significant Benefits To The Settlement Class And The Release Is Narrow.

In a TCPA case, each class member would be entitled to $500 per call and up to $1,500 if they can prove a willful violation of the Act and the Court determines that treble damages are warranted.  While plaintiff submits that it has a strong claim, plaintiff recognizes that defendant has defenses to the claims including whether the facsimiles sent by the Delaware office were advertisements.  The value of the program is $624.00 per class member for a total value of $5,116,800.00.  In addition, each class member had the option to submit a claim form for cash up to $200.00.  *Goldsmith,* at \*5 (approving settlement with a monetary fund representing a portion of the damages that could reasonably have been proven for the class)..

In addition, the settlement is warranted by the complexity, length and expense of continued litigation, satisfying the second *GE Capital* factor.

The settlement satisfies the third *GE Capital* factor because no Class member has  excluded themselves from the settlement and no Class member has objected to the settlement.

### b.      The Settlement Resulted From Extensive Arms-Length  Negotiations

As a leading treatise on class action jurisprudence explains, "…decisions indicate that the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered."  Newberg, §11.51.  *See also*, Section IV(1)(A), *supra* (there is an initial presumption of fairness when a settlement has been negotiated at arms-length by experienced counsel).  The requirement that a settlement be fair is designed to protect against collusion among the parties. *Mars Steel Corp. v. Cont'l Ill. Nat. Bank and Trust Co.*

*of Chicago*, 834 F. 2d 677, 684 (7th Cir. 1987) (approved settlement upon finding of no "hanky-panky" in negotiations). There usually is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. Newberg, §11.42.

Settlement was reached after the close of discovery, which involved (1) contested discovery motions; (2) several sets of written discovery request to Transworld; (3) depositions of sales agents and employees of Transworld[10] including traveling to Tennessee and Pennsylvania for some of the depositions; (4) dozens of subpoenas to third parties for facsimile records[11] and mass e-mails to thousands of sales agents requesting information relating to defendant's practices and follow up contact with persons who responded. ]. Settlement was not reached until after plaintiff prevailed on class certification and after two settlement conferences with a third conference scheduled.

The significant economic benefit to the Settlement Class, coupled with the narrow release, , demonstrate that the settlement is more than fair, reasonable and adequate.

Given the stage of proceedings, the investigation and discovery completed, the proposed settlement satisfies the fifth and sixth *GE Capital* factors.

**The Notice To Class Members Is Adequate**

Under Federal Rule of Civil Procedure 23(c)(2), class members are entitled to notice of any proposed settlement and an opportunity to object or opt out before it is finally approved by the Court. Manual for Complex Litig. (Fourth) § 21.31 (2004). Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S.

---

[10] Transworld also deposed plaintiff.

[11] Transworld had roughly 60 office locations that potentially sent facsimiles and plaintiff attempted to get records for those offices.

156, 174 (1974), *quoting, Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950).

The Notice sent to class members was clear and straightforward, providing putative class members with enough information to evaluate whether to participate in the Settlement, as well as directions on how to seek further information. *Appendix 2* at *Exhibit A.* The Notice contained all of the information required by Rule 23, such as the nature of the action; the class definition; summary of the class claims and defenses; the amount paid for a claim; the potential class representative fee and attorneys' fees and costs; ability to enter an appearance; exclusion rights; objection rights and binding effect of a class judgment on members under Rule 23.

The Claims Administrator faxed and mailed, by first class mail, the Class Notice to persons in the Settlement Class for whom potential mailing addresses were located through the exercise of reasonable diligence. *Appendix 1.*

The notice scheme is consistent with the due process requirements incorporated in Rule 23(c)(2)(B). Rule 23's advisory committee note states that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." Fed. R. Civ. P. 23(d)(2) advisory committee's note. (*citing, Mullane*, 339 U.S. 306 (additional citations omitted).

## IV.   FINAL APPROVAL ORDER

The parties have agreed to the Final Approval Order attached as Exhibit C to the Settlement Agreement that is attached as *Appendix 2.* A copy of the proposed final approval order is also attached hereto as *Appendix 3* for the convenience of the Court. The release that is incorporated into the Final Approval Order is narrowly tailored to claims that "arise out of, or are based upon, the conduct alleged in the Lawsuit – including claims arising out of or relating to the sending of an

unsolicited facsimile advertisement."

## V.    THE ATTORNEY'S FEES AND COSTS ARE REASONABLE.

Pursuant to the Agreement, Class Counsel requests approval of payment of attorney's fees and costs in the amount of $240,000.00, which equals less than 5% of the $5,116, 800.00 value of the settlement.

Plaintiff's counsel includes experienced class action attorneys, all of whom contributed their skills and expended their resources in a coordinated effort that resulted in the settlement of this matter. The Seventh Circuit has specifically authorized the district courts to award attorney's fees using the percentage of fund method. *In re Synthroid Mktg. Litig*., 264 F. 3d 712 (7th Cir. 2001).

Attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Gaskill v. Gordon,* 160 F. 3d 361, 362 (7th Cir. 1998); *Florin v. Nationsbank, N.A.,* 34 F. 3d 560, 566 (7th Cir. 1994); *In re Cont'l Ill. Sec. Litig.,* 962 F. 2d 566, 572 (7th Cir. 1992) *("Cont'l I");* *In re Cont'l Ill. Sec. Litig.,* 985 F. 2d 867, 868 (7th Cir. 1993) *("Cont'l II")*; *Kendrick v. Atcor, Inc.,* 1988 U.S. Dist. LEXIS 8389 (N.D. Ill. 1988).

In *Taubenfeld v. Aon Corp.,* 415 F. 3d 597 (7th Cir. 2005), the Seventh Circuit provided guidance for the award of attorneys' fees in a securities class action:

> [W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." Although it is impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante,* courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases,

and data from class-counsel auctions. *Id.* at 599 (citation omitted). In affirming an award of fees equaling 30% of the $7.25 million settlement fund plus expenses, the *Aon* court considered, among other things, the following factors: (1) "awards made by courts in other class actions" which "amount[ed] to 30-39% of the settlement fund"; (2) "the quality of legal services rendered"; and (3) "the contingent nature of the case."

*Id.* at 600. In considering a fee request, the court must do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.,* 264 F.3d at 718. As discussed below, less than 5% of the value Settlement Fund, which includes expenses in this case and excludes the value of the non monetary benefits of the settlement, is the most appropriate method to "recreate the market" given the nature and scope of the Litigation, the time spent and expenses incurred in its prosecution and the substantial result achieved for the Class.

"'[T]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class,' particularly where that percentage of the benefit approach replicates the market." *Cooper v. IBM Pers. Pension Plan,* No. 99-829, 2005 WL 1981501, at *3 (S.D. Ill. Aug. 16, 2005). The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *See Kirchoff v. Flynn,* 786 F. 2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (emphasis in original).

In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff*, 786 F. 2d at 325; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F. 3d 283, 333 (3d Cir. 1998). If this case were an individual case, the customary fee arrangement would be contingent, on the percentage basis, and in the range of 331/3% to 40% of

13

the recovery. *See Kirchoff* at 323 (observing that "40% is the customary fee in tort litigation" and noting, with approval, contract providing for one-third contingent fee if litigation settled prior to trial); *Retsky Family Limited Partnership v. Price Waterhouse, LLP,* 2001 WL 1568856 at *4 (N.D. Ill 2001) (recognizing that a customary contingent fee is "between 33 1/3% and 40%" and awarding class counsel the requested one-third of the common fund); *Phemister v. Harcourt Brace Jovanovich, Inc.,* No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, at *40–41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the client. The more the recovery, the more the fee. The percentages agreed upon vary, with one-third being particularly common.").

This District has noted that "the Seventh Circuit strongly endorsed the percentage method of computing appropriate fee awards in class action common fund cases." *See Goldsmith v. Tech. Solutions Co.,* 1995 U.S. Dist. LEXIS 15093, *24 (N.D. Ill. 1995) (other citations omitted) (approving 33.33% fee award), *citing Cont 'l Ill. II,* 985 F. 2d 867. This District has also recognized that a fee award of "33 1/3% is in fact in line with that which has, in previous cases, been approved," and "[t]hirty three percent appears to be in line with what attorneys are able to command on the open market in arm's length negotiations with their clients." *Id.* at 26–27. Notably, the Northern District has recognized the appropriateness of a fee of nearly 1/3 of the common fund in complex litigation and the historic approval of such fees in the Seventh Circuit. See *also Family L.P. v. Price Waterhouse LLP*, 2001 WL 1568856 (N.D. Ill. 2001) (33 1/3 % awarded); *In re Lithotripsy Antitrust Litig.,* 2000 U.S.Dist. LEXIS 8143, **6-7 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards in class-action anti-trust lawsuits."); *In re Spyglass, Inc. Sec. Litig.,* No. 99-c-5 12 (N.D. Ill. March 24, 2000) and *In re*

*Spyglass, Inc. Sec. Litig.,* No. 99-cv-0512 (N.D. Ill. May 31, 2000) (33% fee award approved); *Rehm v. Eagel Fin. Corp.,* 1998 U.S. Dist. LEXIS 20015 (N.D. Ill. Dec. 8, 1998) (approving 33.3% fee request), *aff'd Rehm v. EagelFin. Corp.,* No. 96-2455 (N.D. Ill. Dec. 8, 1998) ("the 7th Circuit Court of Appeals, as well as the majority of other circuit courts have approved the use of the percentage of the fund method to award attorneys' fees in class action/common fund cases"); *Taubenfeld,* 415 F.3d at 598 (7th Cir. 2005) (affirming fee award of 33.3%). *Gaskill,* 942 F. Supp. 382, *aff'd* 160 F. 3d 361 (7th Cir. 1998) (38% awarded); *In Re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation,* Case No. 05 CV 07097 (N.D. Ill. 2010) ( Awarded $7.33 million for attorney fees, which is 33% of the common fund); *See also Appendix 4,* Chart of Securities Class Actions awarding fees of 33.3% of the Settlement Fund.

The requested fee of less than 5% of the value of the fund is much less than similar fees awarded by district courts in TCPA class actions. *Saf-T-Gard v Seiko,* 09 C 776 (N.D. *Saf-T-Gard v Seiko,* 09 C 776 (N.D. Ill. 2011) (Judge Bucklo) (Awarding 33% of the common fund); *Hinman v. M and M Rental Center* Inc., 06-cv-01156, Doc. 225(N.D. Ill. 2008) (Awarded 33% of the common fund plus costs); *CE Design, Ltd. v. Cy's Crabhouse,* 07 C 5456 (N.D. Ill.) (Kennelly, J.) (N.D. Ill. Sept. 22, 2010) (Awarded 33% of the common fund plus costs. Doc. 373); *Holtzman v. CCH*, 07 C 7033 (N.D. Ill. Sept. 30, 2009) (Nordberg, J.) (Awarded 33% of the common fund plus costs. Doc. 33);*CE Design, Ltd. v. Exterior Systems, Inc.*, 07 C 66 (N.D. Ill. Dec. 6, 2007) (Darrah, J.) (Awarded 33% of the common fund plus costs. Doc. 32-2); *Locklear Electric, Inc. v. Norma L. Lay,* 09 C 0531 (S.D. Ill.) (Reagan, J.) (Awarded 33% of the common fund plus costs. Doc. 67) *Accounting Outsourcing, LLC. v Verizon Wireless,* 2007 U.S. Dist. LEXIS 97153 (M.D. La. 2007) (Awarded $2,314, 328, which is in excess of 35% of the common fund, plus costs); *Nicholson v*

*Hooters of Augusta, Inc.*, 95-RCCV-616 (Richmond County, Ga. April 25, 2001) (Awarded $3,931,035.62, which was 33% of the common fund plus costs).

While many of courts in this Circuit[12] have questioned the use of the lodestar analysis either for determining the proper amount of fees or as a "cross-check," the attorneys' fee award that Class Counsel seeks is equally reasonable under the lodestar method. *See Schulte*, 805 F. Supp. 2d at 598; *see also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F.Supp.2d 1028, 1037-38 (N.D. Ill. 2011) ("It is not a requisite of reasonable attorneys' fees that Class Counsel engage in laborious litigation over many years. Instead, it is a question of what the Class Members and Counsel would have agreed to *ex ante* in arm's length negotiation."). As such, should the Court desire to perform such analysis, the lodestar approach would certainly confirm the reasonableness of the fees and award requested here.

To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work to be

---

[12] In the Seventh Circuit the use of a lodestar cross-check is not required. *Williams*, 658 F.3d at 636. ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach."); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (recognizing that "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration and holding that it "is unnecessary to resort to a lodestar calculation to reinforce the same conclusion").

presumptively appropriate). Once calculated, the Court must adjust that total by the use of a

multiplier, which accounts for the risk of loss Class Counsel faced when embarking on the

litigation. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 746.

Class Counsel's lodestar in the instant case is reflected in the following chart:

| Staff | Role | Years in Practice | Time | Rate | total | |
|-------|------|-------------------|------|------|-------|---|
| Keith J. Keogh | Partner | 14 | 174.2 | 475 | $82,745.00 | |
| Timothy Sostrin | Associate | 7 | 307.2 | 375 | $115,200.00 | |
| Katherine Bowen | Associate | 1 | 3.3 | 270 | $891.00 | |
| Matthew Seckel | Paralegal | 6 | 38.6 | 150 | $5,790.00 | |
| Kelly Scott | Paralegal | 6 | 0.5 | 150 | $75.00 | |
| Alan Williams | Paralegal | 1 | 141.5 | 125 | $17,687.5 | |
| | | | | | **$222,388.50** | Firm Total |

*See Appendix 5.* Declaration of Keith J. Keogh.

Both the market based percentage approach and the lodestar cross-check support the

reasonableness of this request. In addition to fronting the above fees, class counsel has also paid

$5,935.03 in expenses, which do not include charges for copies or legal research. *Id.*

In addition, the requested multiplier of 1.052 is reasonable and fair in light of the degree of

risk. *See e.g., Cont'l Ill. I*, 926 F.2d at 569 (reversible error found where district court refused to

award a risk multiplier); *Florin*, 34 F. 3d at 565 (risk multiplier mandated in common fund cases

where counsel had "no sure source of compensation."). Awarding fees above the lodestar is

appropriate where the class members receive a significant recovery, and the "purpose of the statute

is actually being fulfilled." *Seidat v. Allied Interstate, Inc.,* No 03 C 975 (N.D. Ill.) (Final Approval

Order, Feb. 24, 2004) (Guzman, J.).

Other courts have awarded fees that resulted in much higher multiples of the lodestar. *See

Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D. N.Y. 1997) (applying multiplier of 5.5) *Willson v.*

*New York Life Insurance Co.*, 1995 N.Y. Misc. LEXIS 652, *94 (S.Ct. 1995) (awarding fee that resulted in multiple of 4.6 times the lodestar), *citing Weiss v. Mercedes-Benz of No. American, Inc.*, 899 F. Supp. 1297 (D. N.J., 1995) (awarding fee that resulted in multiple of 9.3 times the lodestar); *In re RJR Nabisco, Inc.*, Sec.Litig., [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 96,984, at 94,267 (S.D. N.Y. 1992) (multiplier of 6); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D. N.Y. 1991) (multiplier of 8.74); *Glendora Community Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 202 Cal. Rptr. 389 (1984) (fee award was 12 times the lodestar); *Goldenberg v. Marriott PLP Corp.*, 33 F. Supp.2d 434, 439, n. 6 (D. Md. 1998) (noting that multipliers of 3 - 4.5 have been common over the years).

In light of the work performed in this matter, and the actual time and expenses incurred by counsel of $222,388.50 and $5.935.03 respectively, Class Counsel's request for a multiplier of 1.052 is reasonable, particularly as it does not account for time that will be incurred by Class Counsel in insuring that the settlement is implemented according to its terms, and responding to additional inquiries from Class members, which will be at least 10-20 hours. Accordingly, Class Counsel believes the amount requested is reasonable and requests approval of this amount by the Court.

### No Class Member Objected to the Attorneys' Fees and Expenses Requested

As noted above, out of over 8,000 Class Members, no objections to counsel fees and costs were filed. *See Appendix 1.* Based on the foregoing, the Court should grant Class Plaintiff's request for attorneys' fees (inclusive of expenses) in the amount $240,000.00.

## VII.   THE COURT SHOULD ALSO APPROVE THE REQUESTED SERVICE AWARD

Class Counsel requests that the Court approve service awards in the amount of $9,000

18

for plaintiff, which is paid separate from the amount made available to the class.

The Notice informed the Class of this request and no objections to proposed service awards were received. Courts have approved service awards on the basis that Named Plaintiffs in class actions take risks and perform services for the benefit of the Class. *See* Albert Conte and Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS, §11.38 (4th ed.). Indeed, "since without the named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' non-legal but essential case specific expenses." *In re Cont'l I*, 962 F. 2d 571. Since *In re Cont'l I*, service awards for named plaintiffs in class actions have been regularly granted and upheld in this Circuit. *See Cook,* 142 F. 3d 1016 (7th Cir. 1998); *Saf-T-Gard v Seiko,* 09 C 776 (N.D. *Saf-T-Gard v Seiko,* 09 C 776 (N.D. Ill. 2011) (Judge Bucklo) ($12,500 to named plaintiff in TCPA class); *In Re Ameriquest Mortgage Co.* at ¶12. (Awarded service payments of $7,500 to each of the 87 named plaintiffs.); *Gibson & Company Insurance Brokers, Inc. v. QFA Royalties LLC.*, 06-cv-05849-PSG-PLA Document 212 (C.D. Ca. 2009) ($15,000 to the named plaintiff for service payment in TCPA class settlement); *Nicholson v Hooters of Augusta, Inc.*, 95-RCCV-616 (Richmond County, Ga. April 25, 2001) ($15,000 to the named plaintiff in a TCPA class action for service payment).

In fact the Seventh Circuit was recently critical of a $7,500.00 incentive award in a TCPA case as being too small. In *Ira Holtzman , C.P.A, & Associates Ltd. v Turza,* 11-3188 (7th Cir. August 26, 2013) the court described the award as a disincentive award. p.14.

Plaintiff invested time and energy working with counsel, responded to substantial discovery, was deposed, attended two settlement conferences and carried to his potential detriment and the benefit of the Class the substantial risk of nonrecovery. For his willingness to continue to represent

the Class in such circumstances and for its ultimately fruitful efforts on behalf of the Class, plaintiff has earned the requested service award.

Finally, any reduction in the service award would not benefit the class as defendant is paying the incentive fee in addition to any payment to the class members and if it is reduced defendant would retain the difference.

## VIII.   CONCLUSION

For all the reasons set forth above, Plaintiff individually, and as representative of the Class, by Class Counsel, request that this Honorable Court grant final approval of the Agreement and enter the proposed final approval order attached hereto as  *Appendix 3*.

Respectfully submitted,


/s/ Keith J. Keogh

Keith J. Keogh
Timothy Sostrin
Katherine Bowen
KEOGH LAW, LTD.
55 W. Monroe, Suite 3390
Chicago, IL 60603
(312) 726-1092/(312) 726-1093 (fax)
Keith@Keoghlaw.com


## CERTIFICATE OF SERVICE

I, Keith J. Keogh, hereby certify that on September 3, 2013, I filed the foregoing documents with the Clerk of the Court using the CM/ECF System, which sent notification of such filing via electronic mail to all parties of record.

/s/ Keith J. Keogh